## UNITED STATES of America
### v.
### Shelly L. DALE, Tamala Michelle Woods.
### No. 1:99–CR–10.

United States District Court,
E.D. Texas,
Beaumont Division.

March 24, 1999.

David H. Henderson, Jr. Assistant U.S. Attorney, Beaumont, TX, for plaintiff U.S.

Walter J. Pink, Houston, TX, for defendant Dale.

Bruce A. Hoffer, Beaumont, TX, for defendant Woods.

### ORDER

COBB, District Judge.

On January 8, 1999, Shelly Dale was driving a 1998 Toyota rental car east on

Interstate 10 near the city limits of Beaumont, Texas. Tamala Michele Woods was her passenger. Beaumont Police Department officers Froman and LaChance were on patrol at 8:49 a.m. that day and observed that the passenger, Woods, was not wearing a seat belt as required by the Texas Transportation Code, § 543.413.

The patrol unit driver, Froman, activated his emergency lights to stop the automobile for this violation. Dale pulled over, stopped, and exited her car when requested by Froman. Dale, upon questioning by Froman, stated she was from St. Louis, Missouri, and that she and her friend Woods were returning to St. Louis from Houston after attending the private wedding of a friend in Houston, Texas.

Interestingly, the same two persons had been stopped by the same officers about six months before and stated they were returning from Houston to St. Louis after attending the private wedding of a friend. On the prior occasion, Froman received permission to search the vehicle from both occupants, and upon a search, no contraband was discovered, and they continued their journey without further let or hindrance.

On January 8, 1999, Froman noted that he had initialed Dale's Social Security card lightly in pencil, which was his method to indicate a prior stop. Dale, a slender woman, was dressed in loose fitting, billowing clothing, and could not produce her driver's license upon request without considerable searching of the contents of her purse and wallet. She seemed nervous and walked in a slow, stiff-legged, awkward manner upon leaving the rental car and standing by the patrol car. Mrs. Woods complied with LaChance's request that she step out of the passenger side of the car. She stumbled on the paved shoulder as she got out, and walked in a slow, awkward and stiff-legged manner as she approached the patrol car. Officer LaChance called to check on any outstanding warrants for both occupants, and the car registration. He received a report from El Paso Information Center (EPIC) that someone with the same name as Woods had been arrested one year previously in Georgia for possession of either one pound or one kilo of cocaine. (This information was several weeks later found to be in error.) He told Froman about the EPIC report. Froman asked for Dale's consent to search the car, and she voluntarily consented. No contraband was found.

A video camera was automatically activated when the overhead emergency light had been turned on at 8:49 a.m. The videotape was introduced in evidence and viewed by the court. It confirmed his testimony completely.

January 8, 1999, was an overcast, dry, cool day. Neither officer wore a jacket, but merely blue uniform shirts. LaChance, but not Froman, wore a short-sleeved shirt. The two defendants had loose, billowy clothes. The day was quite windy. Woods wore a short-sleeved top also. Both women, while in camera view, were constantly shifting, pulling on their clothes around the midrift, and seemed nervous. Woods requested her short coat or jacket which was brought to her from the car, but she did not wear it over her short-sleeved ensemble, but held it in the front of her body.

The consent was freely given to search the interior of the car and the trunk. No drugs were found. Froman requested a K–9 detection dog. He asked whether Dale had any objections. She voiced none, and later testified she merely wanted to cooperate, so she could proceed on her journey. She was heard on the audio portion of the videotape to agree to the K–9 sniff, even though it might take ten to fifteen minutes for the dog and its handler to arrive at the scene.

The dog arrived and alerted to the trunk area and to the passenger side of the interior compartment. Froman and LaChance searched the passenger compartment and the outside of the luggage, as well as the empty trunk. The dog contin-

ued to alert, but no contraband had been discovered. On this breezy day, LaChance noticed bulges or lumps in the lower midsection of each woman when the wind blew the loose fitting garmets against the bodies of the women. After imparting these observations to Froman, Froman requested a female officer to come to their location. One was not immediately available, but took "about" ten minutes to arrive. After patting down the two women, the female officer discovered foreign objects concealed on each of their persons at and below the waist in the front of each woman. The defendants were placed under arrest, and taken to the nearest police facility with a private restroom. Each was searched by the female officer Valedez, who discovered three kilos of cocaine hidden in each woman's panty hose. The packages were not oblong "bricks" of cocaine, but flat oblong packages approximately ten to twelve inches in size about 1 to 1½ inches thick were taken. Two of these were in the inside thigh or slightly above, in the front of each leg of the women's panty hose, and two rolls, much smaller, were in the waist area of the midsection or front of the panty hose in the area of the abdomen. Thus each woman had one kilogram in each upper leg or groin area, and one kilogram in the abdominal area. The latter was in two one-half portions of cocaine wrapped in plastic grocery bags.

The two defendants were then taken to the local DEA office and read their *Miranda* rights. Dale said she wanted a lawyer present, and the interview was terminated. Shortly thereafter, she said she wanted to cooperate. The other defendant did not request a lawyer according to Agent Ericson of the DEA, and consented to be interviewed.

Both made oral statements that were generally parallel. About six months before, although stopped in Beaumont, they successfully transported two kilograms of cocaine from Houston to East St. Louis, Illinois, concealed in their panty hose.

Each remembered being stopped by the same officers, consenting to a vehicle search, and were allowed to continue their journey after no drugs were discovered.

Though vigorously and exhaustively attacked on cross-examination by the attorneys for the two defendants, it is apparent to the court the statements were voluntarily made. Dale said under direct examination that no promises were made to her. One of the principal reasons the court so finds that their statements were voluntary was that each told DEA agents about the previous successful transportation of four kilograms of cocaine from Houston to East St. Louis, Illinois. In the court's opinion, they would not have been revealed by either defendant (questioned separately), unless both of them voluntarily furnished that particular information.

Although each defendant testified at the suppression hearing that she was threatened by DEA agents with lengthy (six-eight years) prison terms, and frequent requests for a lawyer (all of which were allegedly ignored), it is the opinion of the court from the inherent contradictions in their testimony, their demeanor, their lack of candor the actual and body language, they both were less than candid in their testimony, despite the copious tears shed by defendant Dale almost from the third or fourth question from her attorney. The defendant Woods kept from crying, except when she was finally asked by her attorney about her family. Woods' testimony about her treatment at the hands of the DEA was internally inconsistent, often contradictory, alternately belligerent, evasive, and non-responsive. In this instance, when compared to the DEA's supervising agent's testimony, the testimony of the defendants is not the least persuasive, to put it in the mildest terms available. Dale twice denied any promises were made to her by DEA agents when asked that question by her attorney.

## DISCUSSION

The Fourth Amendment prohibits unreasonable searches and seizures. *United*

*States v. Shabazz*, 993 F.2d 431 (5th Cir. 1993). There is no question but that the stopping of a vehicle and the detention of its occupants is a "seizure" within the meaning of the Fourth Amendment. *Id.* Seizures of motorists who are merely suspected of criminal activity are to be analyzed under the framework established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Id.* A routine traffic stop is a limited seizure that closely resembles an investigative detention and the appellate courts have used *Terry* to analyze cases in which motorists were stopped for violating traffic laws. *Id.* at 435. Under *Terry*, the judicial inquiry into the reasonableness of a search of seizure "is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances the interference in the first place." *Id.*

A. *The initial stop of Defendants' car was a proper traffic stop for the offense of failure of passenger to wear secure seat belt.*

■ Here, as in *Shabazz*, defendants were not merely suspected of criminal activity, but were observed by the detaining officers to commit a traffic offense (failure of the passenger to wear secure seat belt). *See United States v. Castro*, 166 F.3d 728 (*en banc* ) (1999).

■ The traffic stop was valid. The pat-down of both defendants by the woman officer gave probable cause for the search of the defendant's clothing. The valid search of the defendants' clothes yielded six kilograms of cocaine. The motion to suppress the stop, the search and the fruits of the search are admissible, and that part of the motion to suppress is DENIED.

■ This court finds that the oral statements made by the defendants to agents of the DEA were not the results of force, threats, coercion, or promises. At this juncture, that motion to suppress is DENIED.

Upon trial of this matter, however, outside the jury's presence, the court will hear any and all testimony of any witnesses presented by the government and the defendants, and, if there is any substantial additional evidence adduced by any party which requires the exclusion of the oral statements, the court will so rule.

If the court, after hearing the evidence in the jury's absence, rules the oral statements are admissible, the jury will be given the appropriate charge concerning the voluntariness of the confessions, or statements, and instruct the jury concerning their roles in determining the validity of such statements or confessions.

Both defendants' motions to suppress are DENIED.